MILWAUKEE PROFESSIONAL FIRE
FIGHTERS ASSOCIATION, LOCAL
215, IAFF, AFL–CIO, Plaintiff,

v.

CITY OF MILWAUKEE,
et al., Defendants.

MILWAUKEE POLICE ASSOCIATION
LOCAL 21, IUPA, AFL–CIO,
Plaintiff,

v.

CITY OF MILWAUKEE,
et al., Defendants.

MILWAUKEE POLICE SUPERVISORS'
ORGANIZATION, Plaintiff,

v.

CITY OF MILWAUKEE,
et al., Defendants.

MILWAUKEE TEACHERS'
EDUCATION ASSOCIATION, Plaintiff,

v.

MILWAUKEE BOARD OF SCHOOL
DIRECTORS, et al., Defendants.

Nos. 92–C–1378, 93–C–0488, 93–
C–1040 and 93–C–1205.

United States District Court,
E.D. Wisconsin.

Dec. 1, 1994.

Jeffrey P. Sweetland, Timothy E. Hawks, Shneidman, Myers, Dowling & Blumenfield, Milwaukee, WI, for Local 215 Milwaukee Professional Fire Fighters Ass'n, Local 215, IAFF, AFL–CIO.

Monica Rimai, Thomas E. Hayes, Milwaukee City Attys. Office, Milwaukee, WI, for Milwaukee and Milwaukee Employees' Retirement System.

**637**

### DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court are several motions concerning the validity of the duty disability benefits available to thousands of Milwaukee firefighters, police officers, paramedics and educators under the Age Discrimination in Employment Act ("ADEA"). The defendants, the City of Milwaukee and the City of Milwaukee Employees' Retirement System (collectively "the City"), have moved for judgment on the pleadings and for summary judgment. For the following reasons, these motions will be denied. The plaintiffs, the Milwaukee Professional Firefighters Association, the Milwaukee Police Association, the Milwaukee Police Supervisors' Organization, and the Milwaukee Teachers' Education Association (collectively "the Unions") have also moved for summary judgment. For the following reasons, this motion will be granted in part and denied in part.

### I. BACKGROUND

At issue in this case is: (1) whether the plaintiffs have alleged a case or controversy subject to adjudication by this Court; and (2) the legality of the City's Charter Ordinance No. 920400, enacted on July 28, 1992 ("July 28th Ordinance") under the Older Workers Benefit Protection Act ("OWBPA"), P.L. 101–433, 104 Stat. 978 (1990), as it amends ADEA.

### A. THE MILWAUKEE EMPLOYEES RETIREMENT SYSTEM

Chapter 36 of the Milwaukee City Charter ("the Charter") contains the Employees Retirement Act, which embodies the Employees' Retirement System ("ERS"). (Defendants' Proposed Findings of Fact 8). As employees of the City, members of the Unions are members of the Milwaukee ERS, which makes them eligible for certain retirement and disability benefits. Although the retirement system provides for many different employee benefits, only the Service Retirement Allowance ("SRA") and Duty Disability Retirement Allowance ("DDRA") are relevant to this lawsuit.

A SRA is available to retired City employees. Any member of the ERS may retire upon reaching the minimum retirement age. For police officers and firefighters, the minimum retirement age is 57; however, if the officer or firefighter has completed 25 years of creditable service in the system, he or she will be eligible to retire. (Charter § 36–05–1) For all other members of the system, the minimum retirement age is 60. (Charter § 36–05–1–b).

The amount of the SRA available to a City employee upon retirement is calculated based upon his or her years of service. For police officers and firefighters the SRA equals 2.25% of his or her final average salary times the number of years of creditable service up to 25 years of service and 2.4% of final average salary times any years of service thereafter. (Charter § 36–05–1–e–1). For other employees, the SRA is equal to 2% of the members final average salary times the total number of years of all creditable service. (Charter § 36–05–1–d).

Any employee who becomes permanently and totally incapacitated for duty as the result of an on-the-job injury may be eligible to receive a DDRA. (Charter § 36–05–3–a). For police officers and firefighters, a DDRA is equal to 75 percent of current annual salary at the time of injury. (Charter § 36–05–3–c–1–a). However, once an employee reaches the minimum service retirement age, the DDRA is calculated to equal whatever the SRA would be.

Duty disability retirement allowances provide substantially better benefits than service retirement allowances in most instances. For many employees without long periods of service, the actual amount of the benefit received will be greater under DDRA than under SRA. Several other factors add to the attractiveness of DDRA, including that: (1) the SRA is taxable while DDRA is not; (2) the SRA is fixed at the time of retirement while DDRA is continually increased; (3) the survivorship benefit for spouses of employees is substantially better under DDRA than SRA; and (4) the City pays a larger share of health insurance premiums under DDRA than under SRA. (Plaintiffs' Brief in Support of Motion for Summary Judgment at 12–13.)

Under this system, employment-related benefits varied based on the age of the employee because it forced older duty disabled workers to accept the lower SRA in lieu of the more attractive DDRA. (Charter § 36–05–3–b ("[T]he duty disability retirement allowance shall equal the service retirement allowance if such member has attained the minimum service retirement age.")). For example, a 37 year old police officer injured in the line of duty would receive 15 years of duty disability pay. If that officer received that same injury at age 52 with 25 years of service, she would be placed immediately on the lower retirement benefit.

## B. LEGAL CHANGES

In 1989, the United States Supreme Court upheld a benefit program with a provision similar to § 36–05–3–b in *Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). While acknowledging that the Ohio retirement system at issue did in fact discriminate in the distribution of benefits on the basis of age, the Court concluded that the system— which forced a duty-disabled employee over the normal retirement age to accept a smaller service retirement pension rather than the larger duty disability retirement benefit—was acceptable under the ADEA. *Id.* at 165, 109 S.Ct. at 2860. The Court relied on section 4(f)(2) of the ADEA which permitted age-based discrimination pursuant to the terms of a bona fide employee benefit plan, as long as the plan was not used as a "subterfuge" to evade the ADEA. *Id.* at 165–66, 109 S.Ct. at 2860–61.

In determining whether the plan was a "subterfuge," the Court rejected the interpretation used by the Circuit Courts, *see, e.g. EEOC v. Mt. Lebanon,* 842 F.2d 1480, 1489 (3d Cir.1988); *Karlen v. City Colleges,* 837 F.2d 314, 319 (7th Cir.1988) *cert. denied sub nom Cook Cty. College Teachers Union Local 1600 v. Trustees of Community College,* 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988); *Cipriano v. Bd. of Education of North Tonawanda School Dist.,* 785 F.2d 51, 57–58 (2d Cir.1986), and embraced by the

Equal Employment Opportunity Commission, *see* 29 CFR § 1625.10, and the Department of Labor, *see* 34 Fed.Reg. 9708, 9709 (1969) *codified at* 29 CFR § 860.120 (later redesignated as 29 CFR § 1625.10), all of which permitted employers to show a lack of "subterfuge"—and thereby validate discriminatory plans—by proving age-related cost considerations. *Id.* 492 U.S. at 169–75, 109 S.Ct. at 2862–66.

Instead, the Court interpreted "subterfuge" to mean a subjective intent by the employer to discriminate based on age. *Id.* at 171–75, 109 S.Ct. at 2863–66. Ultimately, the Court concluded that the ADEA was not meant to include a prohibition on age discrimination pursuant to a legitimate employee benefit plan, as long as the plan was not being intentionally used to discriminate against older individuals. According to the Court, "Congress left the employee benefit battle for another day." *Id.* at 177, 109 S.Ct. at 2867.

"Another day" arrived almost immediately. Congress took exception to the Supreme Court's interpretation of the ADEA and responded by amending the statute through the Older Workers Benefit Protection Act ("OWBPA"), P.L. 101–433, 104 Stat. 978 (1990). Congress declared that "as a result of the decision of the Supreme Court in [*Betts*] ... legislative action is necessary to restore the original intent in passing and amending [ADEA] ... which was to prohibit discrimination against older workers in all employee benefits except when age-based reductions in employee benefit plans are justified by significant cost considerations." OWBPA, § 101.

In amending the ADEA through OWBPA, Congress first made it clear that benefit plans were in fact subject to ADEA's prohibitions of age discrimination. Section 102 of the Act added a new subsection to the definitions section of ADEA which provided that "[t]he term 'compensation, terms, conditions or privileges of employment' encompasses all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan." OWBPA § 102. Secondly,

section 103 of OWBPA amended section 4(f)(2) to permit age-based discrimination in employee-benefit plans *only* where "the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations." OWBPA § 103. Thus, under OWBPA, if the cost of providing a particular benefit to older workers exceeds the cost of providing the same benefit to younger workers, an employer may provide lesser benefits to the older workers, provided that it spends the same amount on benefits for all workers regardless of age. Therefore, where benefits plans do meet the criteria in § 4(f)(2), "benefit levels for older workers may be reduced to the extent necessary to achieve approximate equivalency in cost for older and younger workers." 29 C.F.R. § 1625.10(a)(1).

In response to the passage of OWBPA, the City enacted the July 28th Ordinance which amended Chapter 36 of the Charter to provide for optional duty disability benefits as an alternative to the current benefits. (Ordinance at 2). Pursuant to section 105 of OWBPA, employees hired prior to October 17, 1992 were to be given the opportunity to elect between the current plan and a modified plan which would comply with OWBPA, but which would provide for lower DDRA benefits.[1] (Ordinance at 2–3 *codified at* Charter § 36–05–3–f).

Now the Unions are challenging the validity of both the original system and the optional duty disability benefit plan under the ADEA. They argue that the original plan violates the statute because it completely disqualifies certain employees from receiving duty disability benefits based solely on age, and that the new plan does not effectively save the old plan because the new plan does not comply with the ADEA as amended. The Unions also allege that the City violated the Wisconsin Municipal Employment Relations Act, §§ 111.70 *et seq.* Wis.Stat., by refusing to collectively bargain with the Unions regarding the content of the optional plan.

---

1. The amount of benefit is 40% of current annual salary for police officers, 37% of current annual salary for firefighters and 68% of current average salary for other employees. Ordinance, at 2.

The City claims, first of all, that the Unions do not have standing to challenge the new plan because no Union member has been actually injured by the plan's enactment. Furthermore, although it concedes that the original plan does not comply with ADEA as amended, the City claims that the old plan is "saved" under the safe harbor provision of OWBPA § 105, because its new plan does in fact comply with the Act because it does not discriminate based on age, and, alternatively, if it does so discriminate, the discrimination is justified under various provisions of the ADEA.

## II. DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

The defendants have moved for dismissal on the pleadings pursuant to Fed.Rule Civ. Proc. 12(c) for plaintiffs' failure to present a case or controversy susceptible to adjudication by this Court. For the following reasons, defendants' motion is denied.

### A. LEGAL STANDARD

■ A motion for judgment on the pleadings should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support a claim for relief. *Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Craigs v. General Electric Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993). This Court may thus grant a motion for judgment on the pleadings only if the movant "clearly establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law." *National Fidelity Life Insurance v. Karaganis*, 811 F.2d 357, 358 (7th Cir.1987).

■ As the issue of standing dictates whether this Court has subject matter jurisdiction over the case, it is an appropriate subject for a motion for judgment on the pleadings. *See Tisza v. Communications Workers of America*, 953 F.2d 298, 300 (7th Cir.1992) (addressing Rule 12(b) motion for judgment on the pleadings); *United States v. The New Silver Palace Restaurant*, 810 F.Supp. 440, 441 (E.D.N.Y.1992) ("A motion to dismiss for lack of subject matter jurisdic-

tion can certainly be raised via a Rule 12(c) motion."). In making our determination under Rule 12(c), we may "consider only matters presented in the pleadings and must view the facts in the light most favorable to the nonmoving party." *National Fidelity*, 811 F.2d at 358. *See also United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir.1991).

■ Because this case involves a union asserting the rights of its members, the requirements for organizational standing must be satisfied. An organization has standing to assert the claims of its members so long as:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). That the plaintiffs satisfy elements (b) and (c) of the test is undisputed. Clearly the structure of an employee benefits plan is germane to a labor union's purpose; the Unions are the sole representatives of their members in matters relating to wages and benefits. (Plaintiffs Proposed Findings of Fact 8, 11, 14, 17). Similarly, it is not alleged that the relief requested—declaration of the benefits plan as illegal under the ADEA—requires the participation of individual union members. Therefore, the sole issue before the Court is whether the union members would have standing to sue in their own right.

The requirements for establishing standing to maintain a lawsuit were recently summarized by the Supreme Court:

> Over the years, our cases have established that the irreducible minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be "likely" ... that

the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). *See also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

**B.** *ANALYSIS*

■ The City does not dispute the satisfaction of the causation or redressability prongs of the standing test. Rather, it limits its objection to the injury requirement, arguing that the Unions do not have standing because none of their members has experienced any injury in fact. The City argues that the plaintiffs have suffered no injury from the modification of the duty disability plan, and will not suffer any injury until "a firefighter or police officer over the minimum retirement age … become[s] duty disabled, appl[ies] for a duty disability retirement allowance, and either [is] rejected or [is] accepted, and receive[s] benefits at the reduced level of the optional plan." (Memorandum in Support of Defendants' Motion·for Judgment on the Pleadings at 9.) We disagree with this characterization, and find that the plaintiffs have alleged sufficient facts to entitle them to proceed with this action.

■ Defendants' attempt to characterize the injury to the plaintiffs as speculative and conjectural is inapposite. While it may be true that the circumstances of the potential injury to a firefighter or police officer in the future are speculative and conjectural, the plaintiffs need not prove impending particularized harm if the injury alleged is *actual* rather than *imminent. Defenders of Wildlife,* 504 U.S. at —— –—— n. 2, 112 S.Ct. at 2138–39 n. 2. Here, the plaintiffs allege that the enactment of the new benefits plan itself caused their members actual injury.

■ Whether the requirements for establishing actual injury are met will depend on whether a "legally-protected interest" has been invaded. *Id.* at ——, 112 S.Ct. at 2136. It is well-established that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing….'" *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) *quoting from Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) *quoting Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148–49 n. 3, 35 L.Ed.2d 536 (1973). Thus, we must look to the statute under which the plaintiffs are suing to determine whether the interest allegedly invaded is in fact legally protected.

Section 4(a) of the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against·any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 · U.S.C. § 623(a)(1). This language creates a legally-protected interest in not being discriminated against in eligibility for employment-related benefits based on age. Thus, age discrimination constitutes an actual injury under the statute. The question then becomes when this injury occurs—at the time a discriminatory benefits plan is enacted or at the time the plan is applied to an individual employee.

■ Several cases addressing statutes of limitation in discrimination suits support the proposition that the injury occurs at the time the plan is enacted. These cases are instructive because federal statutes of limitations begin to run when the plaintiff discovers that he or she is injured. *Martin v. Consultants & Administrators, Inc.,* 966 F.2d 1078, 1101 (7th Cir.1992) (Posner, J., concurring); *Webb v. Indiana National Bank,* 931 F.2d 434, 436 (7th Cir.1991). Thus, whether the statute of limitations has begun to run is relevant to the standing analysis because both depend upon the occurrence of an injury.

In *Equal Employment Opportunity Comm'n v. City Colleges of Chicago,* 944 F.2d 339 (7th Cir.1991), the Seventh Circuit addressed the issue of when an injury occurred under the ADEA for the purpose of commencing the statute of limitations for bringing a discrimination action. There, the EEOC sued City Colleges, alleging that its early retirement plan discriminated based on

age and thus violated the ADEA. *Id.* at 340. The Court concluded that the injury occurred—and therefore that the statute of limitations began to run—at the time the allegedly discriminatory plan was adopted. *Id.* at 343.

In reaching this decision, the Seventh Circuit relied heavily on *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). In *Lorance,* the Supreme Court concluded that the statute of limitations for a suit challenging a seniority system that was neutral on its face but which discriminated against women in its operation began to run when the system was adopted, not when it was applied to the particular women.[2] *Id.* at 905–06, 109 S.Ct. at 2265–66. In making this ruling, the Court relied on the principle that "[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences of the acts* became most painful." *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) *quoting Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979).

■ In determining when the harm occurs in a discrimination suit, it is critical to focus on the nature of the precise violation alleged. If the discriminatory act is the application of the rules of the system to an individual in a discriminatory manner, then the discriminatory act likely does not occur until the system is applied. If, however, as here, the discriminatory act consists of the adoption of a system which discriminates, the injury occurs at the time of the system's adoption. The instant circumstances present the same situation that was addressed in both *Lorance* and *City Colleges:* the legality of the plan is "wholly dependent on the alleged illegality of signing the underlying ... agreement." *City Colleges,* 944 F.2d at 342 *quoting Lorance,* 490 U.S. at 911, 109 S.Ct.

at 2268. The injury occurred at the time of the adoption of the system, and the plaintiffs therefore satisfy the standing requirements permitting this Court to hear the case.

Thus, we hold that any claims available to the Unions arose at the time of the City's enactment of the new charter ordinance on July 28, 1993. Indeed, to make the employees wait for the "painful" harm, as the City suggests, is to make them risk forfeiting altogether as time-barred, any claims they may have. That is what happened in *Lorance* and *City Colleges;* the affected persons waited until they were actually harmed to file their claims and found themselves barred by the statute of limitations that began running when the system was enacted.

In sum, the Unions' complaints, construed liberally, clearly raise sufficient questions concerning the legality of the City's retirement/disability programs. The injury occurred when the systems were enacted; an interest, legally-protected by the ADEA, was invaded by the enactment of the new programs. Therefore, the City's motion for judgment on the pleadings is denied.

### III. *MOTIONS FOR SUMMARY JUDGMENT*

Both plaintiffs and defendants move for summary judgment. Because we find that parts of the modified benefits plan enacted by the City violate the ADEA as amended by OWBPA, we grant plaintiffs' motion in part. Defendants' corresponding motion is, therefore, denied.[3]

#### A. *LEGAL STANDARD*

■ Federal Rule of Civil Procedure 56 provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

**2.** Section 112 of the Civil Rights Act of 1991 was intended to overrule *Lorance. See Banas v. American Airlines,* 969 F.2d 477 (7th Cir.1992). The statute under which *Lorance* was decided now explicitly states that the violation occurs either (1) when adopted, (2) when an individual becomes subject to the system, or (3) when a person is injured by the application of the system. 42 U.S.C. § 2000e–5(e). This amendment does not, however, change the analysis for our

purposes—the injury in question still occurred at the time the discriminatory plan was adopted.

**3.** The City renews its claim that plaintiffs allege no case or controversy in its motion for summary judgment. For the same reasons discussed in Part II, we deny the motion on that grounds as well.

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, or upon conclusory statements in affidavits." *Howland v. Kilquist,* 833 F.2d 639, 642 (7th Cir.1987) (citations omitted). The initial burden is on the moving party to show that there are no material facts in dispute and that judgment should be entered in its favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.1990), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). The burden then shifts to the non-moving party, which must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990).

 The Court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). The existence of a factual dispute will preclude the court from entering summary judgment only if that dispute is outcome-determinative. *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (en banc). "Only disputes over facts that might effect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. ANALYSIS

It is undisputed that the City's original, unmodified retirement system would be in violation of the OWBPA amendments to ADEA absent the City's attempt to "save" it through the provisions of § 105 of OWBPA. In fact, the City concedes that "the passage of OWBPA meant that defendants could no longer prohibit duty disabled employees at or

above their normal retirement age from receiving a DDRA, limiting them to receipt of a SRA." (Defendants' Memorandum in Support of their Motion for Summary Judgment at 31.).

The original system provides that: "[t]he duty disability retirement allowance shall equal the service retirement allowance if such member has attained the minimum service retirement age." Charter § 36–05–3–b. This provision violates ADEA because it discriminates against older employees: a firefighter duty disabled at age 30 can receive the more attractive duty disability benefits, whereas a firefighter duty disabled at age 58 will receive the less attractive service retirement allowance. *See* 29 U.S.C. § 623(a). This is exactly the type of scheme which was upheld by the Supreme Court in *Betts,* 492 U.S. 158, 109 S.Ct. 2854, and explicitly rejected by Congress in passing OWBPA, P.L. 101–433, 104 Stat. 978 § 101.

The City claims that its original plan, though not in compliance with the OWBPA amendments, is saved by the enactment of its optional duty disability benefit plan. In section 105 of OWBPA, Congress provided the States and their political subdivisions with the opportunity to preserve benefit provisions rendered unlawful by the amendments if:

(i) following reasonable notice to all employees, implement new disability benefits that satisfy the requirements of [ADEA]; and

(ii) then offer to each employee covered by [the former plan] the option to elect such new disability benefits in lieu of the existing disability benefits, if—

(I) the offer is made and reasonable notice provided no later than the date that is two years after the date of enactment of this Act; and

(II) the employee is given up to 180 days after the offer in which to make the election.

OWBPA, P.L. 101–433, 104 Stat. 978, § 105(c)(2). That the City complied with the

technical details of section 105 is undisputed.[4] Thus, the only issue before the Court is whether the optional plan complies with ADEA as amended. If the new disability benefits satisfy the requirements of the ADEA, both the original plan and the new plan will be in compliance with the law. However, if the new disability benefits do not satisfy the Act, both the original plan and the new plan must be rejected.[5]

The optional duty disability benefit plan put forth by the City provides:

f–1. Members hired prior to October 17, 1992 shall be given notice of election prior to October 17, 1992 and within 180 days of such notice shall be given a one-time option to elect to have a duty disability benefit apply to them which will be offered on the same terms and conditions as the duty disability benefit which would otherwise apply to them. . . .

\* \* \* \* \* \*

f–1–b. If the member applies for and receives a duty disability benefit within 5 years of the mandatory conversion age, mandatory conversion shall not occur for 5 years from the effective date of the duty disability benefit.

f–1–c. Upon attaining age 62, the member's duty disability benefit shall be reduced by the amount of the normal service retirement allowance payable upon conversion at age 62.

Charter § 36–05–3–f.

The Unions allege that the qualifications contained in both f–1–b and f–1–c violate the amended ADEA. In determining whether the new employee benefit plan complies with the ADEA, we must first look at whether the plan discriminates based on age. 29 U.S.C. § 623(a). The initial burden of proving age discrimination lies with the plaintiffs. Once it is established that the

benefits option does so discriminate, the burden shifts to the defendants to prove that the plan satisfies an exception to the discrimination prohibition. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (Title VII burden shifting); *Karlen v. City Colleges,* 837 F.2d 314 (7th Cir.1988) *cert. denied sub nom, Cook Cty. College Teachers Union v. Trustees of Community College,* 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988).

### 1. *The Five Year Window— Subsection f–1–b*

Subsection f–1–b of the optional plan provides for five years of disability benefits for any employee disabled "within" five years of retirement age. Thus, under this provision, an employee who remains on the job more than five years past minimum retirement age and then becomes disabled must forego duty disability benefits and is placed immediately on retirement benefits. The Unions argue that this provision results in older duty disabled employees not being eligible for any DDRA benefit and therefore discriminates based on age. The City contends that this provision does not discriminate based on age. It claims that all employees regardless of the age they apply for and receive DDRA benefits are subject to the same mandatory conversion policy when they reach the minimum retirement age.

We are convinced that this provision does in fact discriminate based upon age. First, older employees who become duty disabled are eligible to receive DDRA for a shorter period of time than younger employees. For example, a duty disabled 57 year old firefighter would receive a DDRA for five years whereas a 37 year old would receive a DDRA for a minimum of 15 years. Second, older employees may be denied the more lucrative DDRA benefits altogether. To illustrate,

---

**4.** Apparently the Unions have abandoned an earlier allegation that the Milwaukee Employees Retirement System was not a governmental plan subject to section 105(c). Letter of Jeffrey P. Sweetland to Monica Rimai (February 9, 1994) (Defendant's Exhibit 15).

**5.** The optional benefit plan was made available to all employees as of October 17, 1992. Em-

ployees hired since then apparently are subject to no plan whatsoever. The City and the Unions are currently negotiating the duty disability benefit for the union contract period of 1993 through 1995. The City contends that it will retroactively apply this negotiated duty disability benefit to those employees hired after October 17, 1992. (Defendants Proposed Findings of Fact 29).

consider a police officer who reaches minimum retirement age at 52 but stays on the job. If he were to become duty disabled more than 5 years later, at age 58, the officer would be placed immediately on retirement rather than disability.

■ Our analysis does not end with the finding that the City's plan discriminates based on age. As the duty disablement benefit provision is a part an employee benefit package, it may qualify as an exemption to the discrimination prohibition under section 4(f) of the ADEA. That section provides:

It shall not be unlawful for an employer—
... to take any action otherwise prohibited [by this section] ...

(B) to observe the terms of a bona fide employee benefit plan—

(i) where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations....

29 U.S.C. § 623(f). The incorporated regulations provide that: "[r]eductions on the basis of age in the level or duration of benefits available for disability are justifiable only on the basis of age-related cost consideration.... An employer may also avoid such cost increases by reducing the duration of benefits available to employees who become disabled at older ages...." 29 C.F.R. § 1625.10(f)(1)(ii).

The City argues that the five year DDRA window is justified pursuant to the incorporated regulation, 29 C.F.R. § 1625.10(f)(ii), which provides, as examples of cost-based justifications for discriminatory benefits:

In this connection, the Department would not assert a violation where the level of benefits is not reduced and the duration of benefits is reduced in the following manner.

(A) With respect to disabilities which occur at age 60 or less, benefits cease at age 65.

(B) With respect to disabilities which occur after age 60, benefits cease 5 years after disablement. Cost data may be used

to support other patterns of reduction as well.

29 C.F.R. § 1635.10(f)(ii).

The City's plan can, however, fall short of these safe-harbor ages. For example, under the City plan, a teacher's aid, eligible for retirement at age 60, who became disabled at age 58, would receive five years of disability benefits to age 63. To qualify under the safe harbor of 1625.10, the benefits would have to continue until age 65.

The City argues that its new plan meets the safe harbor test on the theory that the ages of 60 and 65 used in the regulation "were meant as illustrative only of a principle having universal application in relation to normal retirement age." (Defendant's Reply to Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment at 7). This argument attempts to read flexibility into the regulation that does not exist. First, § 1625.10 specifically used the ages of 60 and 65 at the time it was incorporated by Congress into the ADEA. Had Congress wished to use "normal retirement age" as a safe harbor instead, it could have done so. In addition, other provisions of the same regulation and the ADEA itself do use the phrase "normal retirement age." *See, e.g.,* 29 C.F.R. § 1625.10(f)(1)(iii)(A); 29 U.S.C. § 623(*l*)(3)(B). Thus, Congress and the agency were clearly aware of the difference between ages 60 and 65 and "normal retirement age." They chose the former in this instance, and we must abide by that decision.

This "safe harbor" clause insulates five year maximums only for disabilities occurring after age 60. If the disability occurs before age 60, the regulations presumes cost-justification if the disability benefits continue until age 65. The City's plan does neither. It imposes five-year maximums on protective service employees disabled as early as age 47 and on other City employees disabled after age 55.

■ Even though this aspect of the plan does not satisfy the safe harbor clause of 29 C.F.R. § 1625.10(f)(ii), it still may be justified by other cost-justification data. The City claims that "because older workers experience duty related disabilities at a higher rate

than younger workers, the cost of providing DDRA to older workers exceeds the cost of providing DDRA to younger workers." (Defendant's Memorandum in Support of Summary Judgment at 31). The City has submitted an actuarial report prepared by the Wyatt Company and Howard Johnson & Company to support this contention. (Affidavit of Danae Davis Gordon). The Unions dispute this contention; in fact, they claim that "the age-based durational limits on the optional benefit result in substantially lower costs—not equal costs—incurred by the City on behalf of older employees than on behalf of younger employees." (Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 8). Plaintiffs submit their own actuarial study which supports their position. (Affidavit of Robert Bolton). Based on this conflicting data, the Court concludes that there is a material dispute of fact regarding the cost-justification of this provision. As such, it is not an appropriate matter for summary judgment.

▮ The Unions further argue that this provision is not a reduction in the amount or duration of the benefits; it is a complete denial of benefits based upon age. According to the Unions, this alone is sufficient to disqualify the new plan entirely despite possible cost justification because the regulations only permit age-based reductions in the level or duration of benefits. We find this argument unpersuasive—we see no reason why a substantial cost differential cannot justify reducing the level or duration of benefits to zero.[6]

Because we find that there is a material dispute of fact as to whether this provision is cost-justified, we deny both parties' motions for summary judgment with respect to section f–1–b.

### 2. Conversion at Age 62— Subsection f–1–c

Under subsection f–1–c of the new plan, a disability benefit received by an employee who turns 62 is reduced by the amount of the individual's retirement benefit. Charter § 36–05–3–f–1–c. This is true despite the fact that the disabled employee is not actually receiving the retirement benefit. (Affidavit of Robert G. Nehls, Ex. 13). City employees are not allowed to receive both retirement and disability income. Only an employee who drops disability and converts completely to retirement can receive retirement benefits. For example, if an officer's duty disability benefit was $2,500 per month and the retirement benefit was $1,500, the disability benefit would drop to $1,000 at age 62 even though the retirement benefit was not actually being paid out. Under the City plan, the officer would be entitled to a maximum of $1,500, available only by going off disability and converting to retirement. In contrast, a younger officer would receive the full duty disability payment.

▮ The Unions assert, and the City does not dispute, that the net effect of this provision is to force conversion to regular retirement benefits at age 62. Under the ADEA, a benefit plan that forces retirement is illegal: "Notwithstanding [the exemption for discrimination pursuant to a bona fide benefit plan] no ... employee benefit plan shall require or permit the involuntary retirement of any individual ... because of the age . of such individual." 29 U.S.C. § 623(f)(2).[7] If an employee is subject to involuntary retirement, the exemption for age-related discrimination subject to a bona fide benefit plan does not apply. *Betts v. Hamilton Co.*, 897 F.2d 1380, 1381 (6th Cir. 1990) *cert. denied*, 498 U.S. 963, 111 S.Ct. 397, 112 L.Ed.2d 407 (1990).

6. We are aware that another Court in our Circuit has concluded that "[n]othing in the ADEA as amended or the regulations that implement it indicate that the total, blanket exclusion of a worker from benefits based upon age is anything but a per se violation of the law." *Quinones v. City of Evanston*, 1994 WL 405963 (N.D.Ill., July 29, 1994).

    However, in that case, the worker was denied admission to the pension system completely. Here, the workers are denied one particular ben-

efit within an entire system. Regardless, we decline to follow the reasoning of *Quinones* Court.

7. Under 29 U.S.C. § 623(j) of the Act, forced retirement of firefighters and police officers was permitted at the retirement age which was in effect on March 3, 1983; 63 years old in Milwaukee. However, this provision was repealed effective December 31, 1993 by P.L. 99–592 § 3(b).

� Manipulating benefits to force retirement is illegal. When an employer forces term of retirement on an employee for reasons that include age, the employer violates the ADEA. *Betts v. Hamilton Co.,* 897 F.2d at 1382. The exclusion of employees from eligibility for disability benefits based solely on age so that those employees are forced to choose the less desirable option of retirement is an "involuntary retirement" under the Act. *Betts v. Hamilton Co.,* 897 F.2d at 1382–83. *See also Smith v. Alum Rock Union School Dist.,* 6 Cal.App.4th 1651, 8 Cal.Rptr.2d 399, 403 (Cal.App. 6th Dist.1992) ("Because [individuals aged 60 and older] are rendered ineligible for a disability allowance by the statute, they are forced to retire in order to obtain benefits. This is an involuntary retirement under the ADEA."). An employer induces involuntary retirement when a condition precedent to receiving the benefit is retirement, *EEOC v. Chrysler Corp.,* 729 F.Supp. 1002, 1009 (S.D.N.Y.1990), and a conditional involuntary retirement program that burdens employees who wish to escape is illegal. *EEOC v. Massachusetts,* 987 F.2d 64, 74 (1st Cir. 1993). Here, only by accepting the burden of reduced disability benefits can a City employee escape the nominally conditional retirement conversion at age 62.

�

 Under the City's plan, an employee who turns 62 on disability and who refuses to convert entirely to retirement benefits gets less than is available under either plan alone (assuming that retirement benefits are at least 50% of the disability amount.) This is a clear inducement for involuntary retirement and is a violation of the Act.

▪ The City attempts to justify this provision under section 4(*l*)(3)(B) which says that disability benefits may be reduced by any pension benefits "for which an individual who has attained the later of age 62 or normal retirement age is eligible." The City maintains that because 62 year old employees are "eligible" for retirement benefits, the City plan is justified in reducing their disability benefits, even though the retirement benefits would not actually be received. The Unions argue that City of Milwaukee employees receiving disability cannot be eligible for retirement benefits because only by converting completely from disability to retirement benefits are retirement benefits available at all.

Section 4(*l*)(3) of the ADEA envisions that the employee will be receiving both the retirement benefit and the disability benefit. The law is designed to prevent double-dipping and to limit the total amount received to no more than the amount of disability alone. The construction proposed by the City would contradict the stated purpose of the 1990 amendments—to protect older workers' benefits.

The legislative history of ADEA supports the view that § 4(*l*)(3) was designed only to prevent double-dipping and was not designed to force selection of inferior benefits. A sponsor of the language referred to it as "disability pension integration" and said the provision would "eliminate any duplicate payments." 136 Cong.Rec. S13,604 (daily ed. Sept. 24, 1990) (statement of Sen. Pryor). Similarly, a principal sponsor of OWBPA said of the provision, "[t]he income stream to the employee is not decreased, only the source of the funds is shifted." *Id.* at S13,606 (statement of Sen. Jeffords). In the House, a principal sponsor said that OWBPA "does not authorize the abrogation of any rights an employee may have that are associated with disability, if those rights are otherwise protected by the ADEA." 136 Cong. Rec. H8623 (daily ed. Oct. 2, 1990) (statement of Rep. Roybal).

The City counters that the legislative history refers only to § 4(*l*)(3)(*A*), which allows reduction of disability benefits by the amount of retirement benefit that the individual "voluntarily elects to receive." The City then argues that because Sub (A) covers double-dipping, Sub (B) would be surplusage unless Sub (B) is seen as covering the amount for which the employee is "eligible," even though that amount is unavailable under the City plan. That argument falls short; Sub (B) is not surplusage, but not for the reasons asserted by the City. Sub (B) applies where employees on disability are also eligible for a retirement benefit. Because City employees on disability are not eligible for retirement as well, Sub (B) is not applicable to this case.

There is no reason to accept the City's contorted reading of "eligible," which would allow the City to engage in a practice contrary to the broad goals of the Act, when a straightforward reading of "eligible" provides benefits protection that is consistent with the Act's purposes. The City therefore, fails in its argument that this provision of its optional benefit plan is protected under section 4($l$). Subsection f–1–c of the Charter is unjustified age discrimination. Therefore, plaintiffs' motion for summary judgment will be granted with respect to this portion of the plan.

### 3. Disabled Employees Restored to Active Service After Their Minimum Retirement Age May Not Be Restored to Membership in the ERS—Sections 07–3 and 03–6

The Unions claim that the optional plan violates ADEA because it retains Charter §§ 36–07–3 and 36–03–6e which discriminate against employees receiving DDRA who wish to return to work after they reach their minimum retirement age. They claim that an employee on DDRA may return to active service, whereas an employee who is required to convert to SRA loses this right, and that age is a determining factor with respect to the exercise of the right to return to active service.

Charter § 36–07–3 provides, in pertinent part:

Should any disability beneficiary be restored to active service prior to attaining the minimum retirement age, the disability allowance shall cease and he or she shall again become a member of the retirement system.... For a person restored to membership under this section, any prior service certificate ... shall be restored to full force and effect, and in addition, upon his subsequent retirement the person shall be credited with all his or her membership service on the basis of which the allowance was computed at the time of disability retirement, and all service credit [accrued while the employee was receiving DDRA].

Under this provision, a younger employee receiving DDRA who is no longer disabled may return to active service and may continue to accrue service retirement credit.

Charter § 36–07–3. In contrast, under charter § 36–03–6–e, "[n]o disability beneficiary restored to active service after attaining the minimum service retirement age shall become a member of this system." Thus, an older employee who is no longer disabled but has passed minimum mandatory retirement age may return to active service, but may not continue to accrue service retirement credit.

The Unions allege that these provisions are a part of the optional disability benefit plan offered to employees. Under the subsection f–1–b of the optional plan, an employee disabled within five years of his or her mandatory conversion age would be entitled to receive DDRA for up to five years. If the employee recovers from his injury after his minimum retirement age and chooses to return to active service, he will not be restored to membership in the ERS and will receive no pension credit for such service. A disabled employee receiving the optional benefit who returns to active service before reaching his minimum retirement age receives full pension credit for all subsequent service.

Plaintiffs allege that these provisions violate § 4(i) of ADEA which makes unlawful "in the case of a defined benefit plan, the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age." 29 U.S.C. § 623(i)(1)(A). They further contend that, because Charter § 36–07–3 provides for restoration of membership in ERS as a benefit to a disability beneficiary who returns to active service, that benefit is not only a "pension benefit" under ADEA § 4(i), but also a "disability benefit" under OWBPA § 105(c)(2).

Thus, argue the Unions, the plan's disqualification of persons over their minimum retirement service age from the benefit of Charter § 36–07–3 violates OWBPA with respect to the City's disability benefits unless it is cost justified under § 4(f) of ADEA. They contend that such cost justification is inconceivable under the system.

The City disputes none of this, and makes no attempt to argue that these discriminatory provisions are in fact cost justified. Instead, it challenges the plaintiffs basis for

bringing these claims, arguing: (1) that the ADEA does not apply to retirees; (2) that the harm alleged by the plaintiffs is too speculative to state a cause of action; and (3) that the plaintiffs' claim is barred by Fed. R.Civ.Proc. 15. We address and reject each of these arguments in turn.

■■■ First, the term "employee" is to be interpreted broadly; retired employees are still considered "employees" under ADEA "as long as the alleged discrimination is related to or arises out of the employment relationship." *EEOC v. Cosmair*, 821 F.2d 1085, 1088 (5th Cir.1987). *See also Passer v. American Chemical Society*, 935 F.2d 322, 330 (D.C.Cir.1991); *Caudill v. Farmland Industries*, 698 F.Supp. 1476, 1485 (W.D.Mo. 1988). Clearly, a City employees' retired status is directly related to the disability/retirement scheme that the plaintiffs allege is discriminatory. To interpret retirees as completely outside the scope of ADEA could potentially eviscerate the protective scheme of the statute.

■■■ Defendants' second argument is similarly meritless. As we concluded in Part II of this opinion, *supra*, the injury about which we are concerned is not the potentially discriminatory application of the plan to individual employees, but rather the enactment of the discriminatory plan itself. Therefore, whether the series of events required to trigger the application of the provision is speculative is irrelevant.

Lastly, the City argues that the Unions attack on this aspect of the optional benefit plan constitutes a new claim not contained in any of the complaints. Thus, it argues, Federal Rule of Civil Procedure 15 prohibits the plaintiffs from raising this claim. Presumably, this argument is based on language in Rule 15(a), which provides that 20 days after the original pleading is served, "a party may amend the party's pleading only by leave of the court or by written consent of the adverse party." Fed.R.Civ.Proc. 15.

This argument is similarly unpersuasive. Under the federal "notice pleading" system, a party need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ. Proc. 8. According to the Supreme Court:

> [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a "short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, — U.S. —, —, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) *quoting Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. (1957).

■■■ The basic contention of the Unions since the inception of this lawsuit has been that the optional duty disability benefit plan violates the ADEA as amended by OWBPA, and that therefore the optional plan does not satisfy the requirements to save the original plan under section 105(c) of OWBPA. We find that these general allegations are sufficient to provide the defendants with "fair notice" of the plaintiffs' claims. In addition, under the statutory scheme the defendants bear the burden of showing that the original discriminatory plan has been saved by an OWBPA-complaint plan. The plaintiffs need not prove every conceivable way in which the optional duty disability benefits plan did not comply with OWBPA. We therefore conclude that Rule 15 does not bar the plaintiffs from raising this claim.

■■■ Therefore, we find that sections 36–07–3 and 36–03–6–e of the retirement system discriminate based on age in that they restrict disability beneficiaries from returning to pensionable service after attaining minimum service retirement age. Because the City offers no cost-justification for this discrimination, we conclude that Charter §§ 36–07–3 and 36–03–6–e violate the ADEA, and therefore grant plaintiffs' motion for summary judgment with respect to these provisions.

### C. CONCLUSION

Because the Court finds that several aspects of the optional duty disability plan proposed by the City violate the ADEA, it will

enter a declaratory judgment that the optional duty disability benefit plan set forth in section 36–05–3–f of the Milwaukee City Charter is invalid. In addition, because the optional plan does not comply with ADEA, City employees were not provided with the choice of an nondiscriminatory optional plan as required by section 105(c) of OWBPA, and the original duty disability plan, to the extent that it violates ADEA, is also invalid.

## IV. *STATE LAW CLAIMS*

We write separately to address plaintiffs' claims pursuant to the Wisconsin Municipal Employment Relations Act ("MERA"). The plaintiffs allege that the City violated this Act by failing to collectively bargain with the Unions over the terms of the optional benefit plan.[8] They urge the Court to assert supplemental jurisdiction over this state law claim and enter a judgment in their favor.

■ The federal jurisdiction statute addressing supplemental jurisdiction provides that:

> [T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367. The Court concludes that the collective bargaining issue under state law is so closely related to the validity of the new scheme under ADEA that it forms a part of the same case or controversy under Article III. The claims, though arising under completely different laws, arise out of common operative facts; both the ADEA claim and the MERA claim arise directly out of the City's adoption and implementation of the optional benefit plan.

■ However, the doctrine of supplemental jurisdiction is one of discretion, not of plaintiff's right. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Landstrom v. Illinois Department of Children and Family Services,* 892 F.2d 670, 679 (7th Cir.1990). In determining whether to exercise this discretion, we are counselled to balance "judicial economy"—"factually related claims between the same parties should be decided in the same court at the same time"—and state prerogative—"a state's own courts should be allowed to decide issues of state law arising in suits between citizens of that state." *Graf v. Elgin, Joliet and Eastern Ry. Co.,* 790 F.2d 1341, 1346 (7th Cir. 1986). When possible, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139.

■ Because we have already concluded that the optional benefit plan violates ADEA, we find that resolving the Wisconsin law issue would be a "needless decision of state law." Therefore, we decline to assert supplemental jurisdiction over the plaintiffs' state law claim.

## V. *CONCLUSION*

For the foregoing reasons, the Court will **DENY** defendants' motion for judgment on the pleadings, and DENY defendants' motion for summary judgment.

Plaintiffs' motion for summary judgment is **GRANTED** in part. The Court declares that the Milwaukee City Charter Sections 36–05–3–b, 36–05–3–c–3–e, 36–05–3–f–1–c, 36–03–6–e are in violation of the Age Discrimination in Employment Act. The defendants are permanently enjoined from enforcing those provisions.

The Court finds that there is a material dispute of fact with respect to Milwaukee City Charter § 36–05–3–f–1–b, and therefore **DENIES** both parties' motions for summary judgment related thereto.

Finally, the Court declines to exercise supplemental jurisdiction over the related state law claim.

**SO ORDERED.**

---

8. MERA provides that: "It is a prohibited practice for a municipal employer ... [t]o refuse to bargain collectively with a representative of a majority of its employees in an appropriate collective bargaining unit." Wis.Stats. § 111.70(3).